**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NOS. 23-454-1 24-253-2** |
| | : | |
| **RAKEIM SAVAGE** | | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Rakeim Savage played a major role in two major criminal conspiracies. In Criminal No. 23-454, Savage admitted to a large-scale organized cargo theft conspiracy. He committed brazen tractor-trailer thefts, including the hallmark heist of over $230,000 worth of U.S. dimes on April 13, 2023. And in Criminal No. 24-253, Savage admitted to participating in the OMERTA racketeering enterprise, which perpetrated acts of counterfeiting and mail and wire fraud, along with other violent acts to protect OMERTA's reputation and territory. Savage's extensive criminal conduct in both cases stems from one fundamental choice: to live unconstrained by the law and enrich himself through illegal activity.

For these reasons, the government recommends a sentence of incarceration within the advisory guideline range of 87-108 months, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum. Consistent with the plea agreement between the parties, the government recommends that Savage's sentences on his two cases run concurrently.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I. BACKGROUND

The facts of each case are set forth in the government's change of plea memoranda. *See* Crim. No. 23-454, Dkt. No. 306; Crim. No. 24-253, Dkt. No. 155. In summary, between

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

January 1 and July 31, 2023, Savage conspired with his co-defendants to steal goods moving as parts of interstate shipments located on tractor trailers around Philadelphia. While a trailer was unattended overnight, or while the driver was asleep, the members of the conspiracy participating in the theft would use bolt cutters and other tools to break into the trailer and steal the goods inside. The members of the conspiracy would then offer the goods for sale to contacts around Philadelphia. Among other acts, Savage admitted to participating in the robbery of a tractor trailer carrying commercial refrigerators on April 1, 2023, during which members of the conspiracy attacked and injured the driver; and, as mentioned, the theft of over $230,000 worth of U.S. dimes on April 13, 2023. The members of the conspiracy committed numerous other thefts, stealing goods with a total estimated value of more than $1.5 million from more than 10 victims.

Meanwhile, from at least August 2018 through August 2023, Savage conspired with others to conduct the OMERTA enterprise, a violent neighborhood organization operating primarily in the Strawberry Mansion neighborhood of Philadelphia. The purpose of the OMERTA enterprise was to enrich its members and associates through criminal activities, including counterfeiting U.S. currency, robbery, theft, drug trafficking, and fraud, and to preserve and protect the power, territory, and profits of the organization through acts of intimidation, threats, and violence. OMERTA members used firearms to protect gang territory, retaliate against rivals, and enforce discipline within the organization.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

#### 1. Criminal No. 23-454

The maximum sentence for conspiracy (Count One) is 5 years' imprisonment, up to 3 years' supervised release, a $250,000 fine, and a $100 special assessment. *See* 18 U.S.C. § 371.

The maximum sentence for Hobbs Act robbery (Count Two) is 20 years' imprisonment, up to 3 years' supervised release, a $250,000 fine, and a $100 special assessment. *See* 18 U.S.C. § 1951.

The maximum sentence for theft from an interstate shipment, possession of stolen goods from interstate shipment theft, theft of government money, or receiving stolen government money (Counts Three through Ten), is 10 years' imprisonment, up to 3 years' supervised release, a $250,000 fine, and a $100 special assessment. *See* 18 U.S.C. §§ 641, 659.

Thus, the total maximum penalty on Crim. No. 23-454 is: 105 years' imprisonment, up to 3 years' supervised release, a $2.5 million fine, and a $1,000 special assessment. Restitution and forfeiture may also be ordered.

#### 2. Criminal No. 24-253

The maximum sentence for conspiracy to participate in a racketeering ("RICO") enterprise (Count One) is life imprisonment, a five-year period of supervised release, a $250,000 fine, and a $100 special assessment.

The maximum sentence for conspiracy to commit counterfeiting (Count Eight) is 5 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

The maximum sentence for conspiracy to commit mail and wire fraud (Count Nine) is 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Thus, the total maximum penalty on Crim. No. 24-253 is life imprisonment, a five-year period of supervised release, a $750,000 fine, and a $300 special assessment. Restitution and forfeiture may also be ordered.

**B. Sentencing Guidelines Calculation**

The Probation Office correctly calculated Savage's advisory guideline range of imprisonment as 87-108 months.

**1. Criminal History Category**

Savage is in criminal history category III. Savage has a 2017 conviction for fleeing or attempting to elude an officer, for which he was sentenced to 10 months of probation. This conviction results in 1 criminal history point. Savage also has a 2018 conviction for possession of oxycodone and marijuana, for which he was sentenced to 6 months of probation. This conviction results in 1 criminal history point. Finally, Savage has a 2022 conviction for DUI. He was first admitted into the Accelerated Rehabilitation Disposition ("ARD") program, but later sentenced to 72 hours to 6 months of imprisonment and paroled in February 2024. This conviction results in 2 criminal history points. Savage was on probation while committing part of the instant offenses, but does not receive any additional criminal history points. Thus, Savage's total criminal history score is 4, establishing a criminal history category of III. PSR ¶¶ 170-178.

**2. Offense Level: Crim. No. 23-454**

Savage's conduct in Criminal No. 23-454 results in two groups: one for the April 1, 2023 robbery (Group Two), and one for all other counts (Group One). *See* PSR ¶¶ 116-117.

For Group One, the base offense level is 6. PSR ¶ 123. The offense level is increased by 16 because the loss amount is more than $1.5 million, as the parties stipulated in their plea agreement. PSR ¶ 124. The offense level is increased by 2 levels because the offense involved 10 or more victims, and another 2 levels because the offense involved "an organized scheme to steal or to receive stolen . . . goods or chattels that are part of a cargo shipment." PSR ¶¶ 125-126. The adjusted offense level is therefore 26. PSR ¶ 130.

For Group Two, the base offense level is 20. PSR ¶ 131. The offense level is increased by 2 levels because the victim, O.S., suffered bodily injury. PSR ¶ 132. The adjusted offense level is therefore 22. PSR ¶ 136.

**3. Offense Level: Crim. No. 24-253**

Savage's conduct in Criminal No. 24-253 results in four additional groups: one for the RICO conspiracy and conspiracy to commit counterfeiting (Group Three), one for the RICO conspiracy and conspiracy to commit mail and wire fraud (Group Four), one for drug distribution as part of the RICO conspiracy (Group Five), and one for illegal gambling as part of the RICO conspiracy (Group Six). *See* PSR ¶¶ 137-160.

For Group Three, the base offense level is 25. PSR ¶ 137. The applicable guideline for the conspiracy to commit counterfeiting is USSG §2X1.1, which applies the base offense level for the substantive offense and any adjustments for intended conduct that can be established with reasonable certainty. Here, the substantive counterfeiting offenses are governed by USSG §2B5.1. The base offense level is 9, which is increased by 14 levels because the loss amount was more than $550,000 but not more than $1.5 million, and by another 2 levels because Savage

possessed a firearm in connection with the offense. PSR ¶ 137. The adjusted offense level is therefore 25. PSR ¶ 142.

For Group Four, the base offense level is 7. PSR ¶ 143. The offense level is increased by 12 levels because the mail and wire fraud scheme caused a loss of more than $250,000 but not more than $550,000. PSR ¶ 144. The adjusted offense level is therefore 19. PSR ¶ 148.

For Group Five, the base offense level is 19. PSR ¶ 149. Because the quantity of controlled substances involved in the drug distribution activity is unknown and the offense level therefore cannot be calculated under USSG §2D1.1, the applicable offense level is 19 pursuant to USSG §2E1.1. PSR ¶ 149. There are no additional adjustments, and the adjusted offense level is therefore 19. PSR ¶ 154.

For Group Six, the base offense level is 19. PSR ¶ 155. Because the base offense level for the illegal gambling activity under USSG §2E3.3 would be less than 12, the applicable offense level is 19 pursuant to USSG §2E1.1. PSR ¶ 155. There are no additional adjustments, and the adjusted offense level is therefore 19. PSR ¶ 160.

### 4. Total Offense Level and Guideline Range

Group One has the greatest adjusted offense level (26), and the combination of the groups results in a multi-count adjustment of 4 levels. PSR ¶¶ 162-164. The offense level is reduced by 3 because Savage accepted responsibility, resulting in an offense level of 27. PSR ¶¶ 165-168.

Thus, the applicable guideline range of imprisonment, based on a criminal history category of III and an offense level of 27, is 87-108 months. PSR ¶ 223.

## C. Defendant's Objections to the Presentence Investigation Report

The defendant raises five objections to the Presentence Investigation Report ("PSR"). As set forth below, each objection should be overruled.

### 1. Objection to Paragraph 93

The defendant objects to the portion of paragraph 93 stating that Savage provided financial support for incarcerated OMERTA members, helped them smuggle contraband into prisons, and directed the activities of non-incarcerated OMERTA members. In particular, the defendant questions the evidence supporting the assertion that he assisted in smuggling contraband and contends that providing money to an incarcerated friend does not establish that he did so to ensure the continuity of OMERTA.

The objection should be overruled. The challenged information derives from Count One of the Superseding Indictment, the RICO conspiracy count to which Savage pleaded guilty, and is supported by communications between Savage and co-defendant Jahlil Williams. Those communications demonstrate that Savage's financial assistance to Williams was intertwined with discussions concerning the smuggling of contraband into prison.

For example, on March 31, 2023, Williams asked Savage to send Williams's sister $50 to be placed on Williams's inmate account. Savage then asked Williams, "You still got them 100 subs?," referring to Suboxone strips. Minutes later, Williams asked, "She ain't tryn bring in no cigarettes? I can pay her 500 a piece to bring both in." Savage and Williams thereafter continued discussing the amounts and methods of payment to the third party involved in bringing contraband into the prison. These communications provide ample support for the PSR's

description of Savage's conduct and demonstrate that his assistance to incarcerated OMERTA members extended beyond simply providing money to a friend.

### 2. Objection to Paragraph 97

The defendant next objects to paragraph 97, which describes an exchange in which Williams told Savage that he needed money to pay an individual in connection with a potential murder-for-hire and stated that he would "pay em when its done," which Savage acknowledged that he understood. The defendant argues that he was never conclusively connected to the murder-for-hire plot, was not separately charged with that offense, and did not specifically admit to it in connection with his guilty plea.

This objection should likewise be overruled. The PSR does not allege that Savage personally participated in the murder-for-hire plot beyond what is reflected in the communications themselves. Rather, it accurately recounts an exchange demonstrating that Savage was aware of the contemplated murder-for-hire and was involved in a discussion concerning its financing.

More importantly, this conduct was specifically charged as Overt Act 121 of Count One of the Superseding Indictment. Savage pleaded guilty to Count One. Accordingly, the exchange is properly included as part of the factual description of the RICO conspiracy, regardless of whether Savage was separately charged with a substantive murder-for-hire offense.

### 3. Objection to Paragraph 98

The defendant objects to paragraph 98's statement that Savage helped OMERTA plan violent acts and provided firearms and other means to accomplish violent acts. He contends that his identified racketeering predicates were counterfeiting and mail fraud and questions both the

evidentiary support for and relevance of the PSR's description of his involvement in OMERTA-related violence.

The objection should be overruled. Again, the challenged information is derived from Count One of the Superseding Indictment, to which Savage pleaded guilty, and is independently supported by communications among OMERTA members and social-media content created by or featuring Savage.

Among other things, Savage discussed retaliating for the deaths of OMERTA members. On December 24, 2019, following the murder of an OMERTA member, Savage posted on Instagram: "took a couple losses charge it to the game, can't nothing bring the guys back but they gone feel our pain!" Similarly, on March 16, 2023, Savage and Williams discussed the death of another friend. Williams encouraged Savage to "give all this shit up," but Savage responded that he could not because he "can't let that goofy walk around."

The evidence also reflects Savage's involvement with firearms. Savage posted photographs and videos depicting himself with firearms and exchanged messages concerning the possession and transfer of firearms. For example, on January 1, 2020, Savage received a message directing him to "[b]ring the jawn for me," and Savage agreed. Law enforcement understands "jawn," in the context of that exchange, to refer to a firearm. On May 19, 2020, Savage similarly sent a message asking, "You got my gat?," to which the recipient responded affirmatively. Law enforcement understands "gat" to be slang for a firearm. Taken together, this evidence supports the PSR's description of Savage's role in OMERTA's violent activities.

#### 4. Objections to the Drug-Distribution and Illegal-Gambling Guidelines Calculations

Finally, the defendant objects to paragraphs 149 through 160, which calculate offense levels for drug distribution and illegal gambling as underlying offenses of the RICO conspiracy.

The defendant argues that these groups should not be included because he did not separately plead guilty to substantive drug-distribution or illegal-gambling offenses.

These objections should be overruled. Drug distribution and illegal gambling were alleged as racketeering activity and overt acts in Count One of the Superseding Indictment, the RICO conspiracy to which Savage pleaded guilty. Both drug trafficking and specified gambling offenses constitute "racketeering activity" under 18 U.S.C. § 1961(1).

The Guidelines expressly contemplate consideration of the underlying offenses in calculating the offense level for a RICO conspiracy. Section 1B1.2(d) provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." USSG § 1B1.2(d). Likewise, Application Note 1 to USSG § 2E1.1, the Guideline applicable to RICO offenses, directs that "[w]here there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction."

Accordingly, the fact that Savage was not separately convicted of substantive drug-distribution or illegal-gambling offenses does not, standing alone, preclude consideration of those offenses in calculating the applicable Guidelines range for his RICO conspiracy conviction. The PSR therefore properly included the drug-distribution and illegal-gambling groups in its Guidelines analysis, and the defendant's objections should be overruled.

## III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual

sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**A. Consideration of the 3553(a) Factors Regarding Imprisonment**

Savage was a major player in two major criminal conspiracies. With respect to Criminal No. 23-454, Savage was a central figure in an organized scheme of relentless cargo thieves. For months, Savage and his co-conspirators created chaos and fear for truck drivers while enriching themselves with stolen goods. Savage and his co-conspirators committed more than a dozen cargo thefts, stealing more than $1.5 million worth of goods—including over $1 million in a

two-week span in April 2023 alone. That spree saw Savage and his co-conspirators pillage a tractor trailer carrying huge commercial refrigerators—injuring and terrifying the driver in the process—two tractor trailers carrying over 30,000 pounds of crab legs each, another tractor trailer carrying more than 100 Samsung 75-inch televisions, and yet another tractor trailer on April 13, 2023, from which Savage and his co-conspirators stole more than $230,000 worth of U.S. dimes. According to the online currency weight calculator the defendants used (omnicalculator.com/everyday-life/money-weight), that is more than 11,700 pounds of dimes.

These were massive heists. Executing them required extensive coordination among a large group of criminal associates—evident from the text messages and phone records collected in this case—as well as large vehicles, like the box truck the defendants used in the thefts. And the defendants carried on ransacking tractor trailers for the better part of 2023. They scouted victims, stole as much cargo as they could get their hands on, and found buyers for their stolen wares to profit from their crimes. Each theft posed a risk of harm to the driver, as well as any bystander, security guard, or law enforcement officer who might have stood in the defendants' way. That is precisely how O.S. became a robbery victim on April 1, 2023. When he woke up to the defendants unloading his truck in the middle of the night, he was chased, captured, restrained, and injured. He remains terrified. *See* PSR ¶ 108.

To Savage and his co-conspirators, each crime was a victory to celebrate. Their months-long group text-message chat was used not only for coordinating, but also for congratulating each other.[2] In addition to pictures of the goods they stole, Savage and his co-conspirators took

---

[2] It was also used for ridicule. For instance, after the April 1, 2023 robbery, during which O.S. was assaulted, Savage texted the group, ""I swore nobody was on that truck yo. We was making all that fucking noise." Co-defendant Malik Palmer mocked his co-conspirators who did not

*continued . . .*

and circulated pictures of each other committing the thefts. For instance, on April 3, 2023, co-defendant Malik Palmer asked Savage to "send them pictures u took at gas station," and Savage circulated pictures of Palmer with the box truck used during the April 1, 2023 refrigerator robbery:



Then after the dime heist, on the morning of April 13, 2023, co-defendant Douglas Mathis sent a text message to the group, showing a picture of Malik Palmer swimming in a truck bed full of dimes:

---

assault the driver. He said to the group: "Never seen so many gangsters run from a little ass Mexican wit nothing but draws [sic] on. . . . Driver came out naked everyone ran to they cars."



The next day, April 14, 2023, Savage texted the group a screenshot of an Instagram post about the theft. Savage said, "We made it!"




Savage touted his gang affiliations, too. After sending the post about the theft, Savage sent a picture of himself wearing a "Zoo Gang" chain (a North Philadelphia organization connected to Savage's OMERTA enterprise) as well as a "Dirty Block" chain (another North Philadelphia criminal organization comprised of several of Savage's co-defendants):



The group chat among Savage and his co-conspirators is replete with similar exchanges. Later on April 14, 2023, Malik Palmer texted the group about "going to live [i.e., Live! Casino] tonight for a victory dinner." And on March 31, 2023, Malik Palmer texted the group, "Had fun last night . . . And ppg [i.e., Douglas Mathis] the way he jump out his skin when he seen the white bull come outside the truck was too funny I love u dudes." Co-defendant Saikeen Dixon texted: "Last night was mad real . . . Send me pics of the salmon . . . Who ever got it." Malik Palmer then messaged: "I can't wait till tonight man . . . I was driving home just laughing at what happen last night." That night, Savage and his co-conspirators robbed O.S.

These exchanges show that Savage and his co-defendants were proud of these crimes. And they enjoyed them. Simply put, the nature and extent of the defendants' cargo-theft crimes warrant a serious penalty.

With respect to Criminal No. 24-253, Savage was a significant participant in OMERTA, a violent, neighborhood-based criminal enterprise operating primarily in the Strawberry Mansion section of Philadelphia. For approximately five years, from 2018 through 2023, Savage participated in and helped sustain an enterprise that enriched its members through counterfeiting, fraud, robbery, theft, drug trafficking, and other crimes, while its members used firearms, threats, intimidation, and violence to protect the organization, retaliate against rivals, and preserve its power. When OMERTA members were incarcerated, Savage continued communicating with and financially supporting them, assisted with the smuggling of contraband into prison, and remained actively involved with OMERTA members who were still on the street.

Savage's own communications demonstrate the extent of his involvement in OMERTA's activities. On January 2, 2020, when OMERTA members discussed obtaining counterfeit currency from a rival source, Savage intervened and instructed them not to do business with known enemies. That same day, Savage discussed the location and transfer of one of OMERTA's firearms. In February 2020, Savage again discussed firearms with another OMERTA member, explaining that he needed to retain a gun for protection on his block. And Savage's involvement continued even as other members of OMERTA went to prison. In March 2022, incarcerated OMERTA member Basil Moses used Savage as an intermediary to seek money from other members. In April 2022, Savage communicated with incarcerated OMERTA member Jahlil Williams about a social-media post identifying OMERTA members in connection with a murder. These were not isolated associations with individuals who happened to commit crimes. Savage spent years immersed in OMERTA and participated in a wide range of the organization's criminal activities.

Those activities were extensive and lucrative. Counterfeiting was one of OMERTA's

principal sources of criminal proceeds. Over approximately five years, OMERTA members attempted to pass or successfully passed more than $1.2 million in counterfeit United States currency. Savage participated in the organization's counterfeiting operation, including by discussing the sources from whom OMERTA members obtained counterfeit currency and directing members not to obtain counterfeit currency from a rival source. The proceeds, in turn, helped finance OMERTA and its other criminal activities. The scale and duration of the counterfeiting scheme demonstrate that this was not opportunistic criminal conduct, but a sustained source of funding for an organized criminal enterprise.

Savage also personally participated in OMERTA's scheme to steal hundreds of thousands of dollars from a government program intended to assist people who lost their livelihoods during the COVID-19 pandemic. On May 22, 2020, Savage submitted a fraudulent Pandemic Unemployment Assistance application under penalty of perjury, falsely claiming that he was unemployed because of COVID-19 and seeking employment. Based on those false representations, Savage obtained approximately $37,425 in benefits to which he was not entitled. His conduct was part of a broader OMERTA fraud scheme that resulted in at least $443,700 in fraudulent benefits being paid to members of the organization.

Thus, Criminal No. 24-253 reflects years of deliberate and organized criminal conduct. Savage participated in an enterprise that generated money through counterfeiting, fraud, drug trafficking, and other crimes; maintained access to firearms; used violence and intimidation to protect its interests; and continued operating even when some of its members were incarcerated. At the same time, Savage personally participated in schemes that generated substantial criminal proceeds for himself and his associates. The duration, breadth, and seriousness of this conduct warrant a significant sentence.

Meanwhile, Savage has no significant record of gainful employment. PSR ¶¶ 218-219. Rather, he has devoted his time and effort to building criminal networks that allow him to enrich himself through illegal activity. His decision to live unconstrained by the law warrants a significant penalty in this case.

For these reasons, a term of imprisonment in the applicable guideline range is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2). Furthermore, a guideline sentence of incarceration would afford adequate deterrence to others who would commit a similar offense, and protect the public from further crimes of Savage, for at least as long as he remains incarcerated. *Id.* In addition, adherence to the recommended guideline range would assure that Savage's sentence is consistent with those imposed nationwide on similarly situated offenders, thus complying with Section 3553(a)(6) and avoiding undue disparity.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D).

**B. Restitution**

With respect to Criminal No. 23-454, a restitution order is appropriate and, indeed, mandatory. *See* 18 U.S.C. § 3663A. Paragraph 7 of the plea agreement between the parties provides for restitution in the amount of $234,474.80, but the plea agreement does not specify how restitution should be allocated among the victims of the offense. The government's restitution analysis and investigation (which was completed in large part after defendant Savage pled guilty) is explained in detail in its restitution memorandum filed with respect to co-defendant Salahudin Reddy on August 20, 2026, and the materials supporting the government's

restitution analysis have been made available to all defendants. *See* Dkt. No. 380. All of the losses resulting from Savage's cargo-theft conspiracy were reasonably foreseeable to Savage, and thus, all should be considered in determining restitution. *See id.* at 3-5. The government respectfully submits that defendant Savage's restitution of $234,474.80 should be allocated *pro rata* among all of the victims of the conspiracy, as follows[3]:

| **Date of Theft** | **Victim 1** | **Amount Owed to Victim 1 (%)** | **Victim 2 (if any)** | **Amount Owed to Victim 2(%)** |
|---|---|---|---|---|
| 1/27/2023 | Pantos USA Inc. | $7,484.72 (3.19%) | | |
| 2/17/2023 | Daikin Comfort Technologies | $7,763.93 (3.31%) | | |
| 3/2/2023 | Heaven Hill Brands | $571.36 (0.24%) | | |
| 3/7/2023 | Butterball | | | |
| 3/10/2023 | Progressive Insurance Company | $13,226.89 (5.64%) | JBS USA Food Company | $603.57 (0.26%) |
| 3/17/2023 | Titanium American Logistics, Inc. | $2,132.14 (0.91%) | Sandhu Roadliner Inc. | $796.66 (0.34%) |
| 4/1/2023 | National Refrigeration & A/C | $7,830.49 (3.34%) | O.S. | $205.49 (0.09%) |
| 4/4/2023 | International Seafood and Bait | $39,896.15 (17.02%) | | |
| 4/6/2023 | International Seafood and Bait | $27,498.20 (11.73%) | Travelers Property Casualty Company of America | $21,694.83 (9.25%) |
| 4/10/2023 | Shen Group, Inc. | $54,237.08 (23.13%) | | |
| 4/13/2023 | Keen Cargo, Inc. | $41,413.96 (17.66%) | Coin Wrap, Inc. | $496.81 (0.21%) |

[3] The government calculated these percentages using the total proposed restitution resulting from all thefts of $1,080,786.44. *See* Dkt. No. 380, at 6. The government divided the award to each victim by the total $1,080,786.44 amount to determine the percentage of the total restitution award paid to each victim, and then applied the same percentage to the $234,474.80 restitution award proposed for Savage.

| | | | | |
|---|---|---|---|---|
| 4/26/2023 | | | | |
| 7/3/2023 | Class 1 Transport, Inc. | $2,765.95 (1.18%) | | |
| 7/10/2023 | | | | |
| 7/17/2023 | | | | |
| 7/20/2023 | Sentry Insurance Co. | $5,856.56 (2.50%) | | |

The government submits that Savage and his co-defendants should be jointly and severally liable for restitution, up to the amount of $234,474.80. The Mandatory Victims Restitution Act ("MVRA") provides that "if more than 1 defendant has contributed to a victim's loss, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss." 18 U.S.C. § 3664(h); *see also United States v. Kolodesh*, 787 F.3d 224, 242 (3d Cir. 2015) (Section 3664(h) "explicitly provides for joint and several liability in the full amount [of the victim's loss]"); *United States v. Crim*, 553 F. App'x 170, 173 (3d Cir. 2014) (not precedential) (holding that "[u]nder 18 U.S.C. § 3664(h), the court may make each defendant liable for the full amount of restitution or it may apportion liability among the defendants."); *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001) (court may "impose joint and several liability on multiple defendants for restitution, permitting the victim to recover its losses from all or some of the wrongdoers."). The first approach under Section 3664(h) is commonly known as "joint and several liability" and the second is known as "apportionment of liability." *United States v. Yalincak*, 30 F.4th 115, 122 (2d Cir. 2022). In choosing which approach is appropriate in a particular case, "a sentencing court enjoys broad discretion." *United States v. Ochoa*, 58 F.4th 556, 561 (1st Cir. 2023). In this case, the government submits that joint-and-several liability for restitution, up to the amount of $234,474.80, is appropriate to ensure that the victims

are compensated to the fullest extent possible, particularly in light of Savage's degree of participation.

When imposing restitution, the court also is required to "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid" in consideration of the defendant's financial resources, projected earnings, and financial obligations. 18 U.S.C. § 3664(f)(2); *United States v. Coates*, 178 F.3d 681, 683 (3d Cir. 1999); *Crim*, 451 F. App'x at 210 (MVRA mandates that the judgment include a payment schedule in consideration of the defendant's economic circumstances); *United States v. Lessner*, 498 F.3d 185, 201 (3d Cir. 2007). The Third Circuit has stated: "[i]n so doing, the district court is required to consider the financial resources, projected earnings, and financial obligations of the defendant. The court may order the defendant to make a single lump-sum payment, reasonable periodic payments, or, if the defendant is indigent, nominal periodic payments." *Coates*, 178 F.at 683, citing 18 U.S.C. § 3664(f)(3)(A), (B). Notably, "[a] person sentenced to pay . . . restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments." 18 U.S.C. § 3572(d)(1). "If the judgment, or, in the case of a restitution order, the order, permits other than immediate payment, the length of time over which scheduled payments will be made shall be set by the court, but shall be the shortest time in which full payment can reasonably be made." 18 U.S.C. § 3572(d)(2).

In this case, because Savage appears to lack significant assets and will likely be serving a period of incarceration, the government submits that the Court should Order that Savage pay restitution in periodic installments. Specifically, the government submits that Savage should be ordered to pay restitution while incarcerated at the minimum rate of $25 per quarter through participation in the Inmate Financial Responsibility Program administered by the Bureau of

Prisons, and upon commencement of supervised release, to pay restitution in an amount determined by the U.S. Probation Office and approved by this Court.

**C. Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least 2 years is warranted. Supervision following release from imprisonment is warranted to aid Savage's reentry to society, particularly given his lack of employment history, and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, 18 U.S.C. § 3553(a)(2)(B), protect the public, *id.* § 3553(a)(2)(C), and assure that Savage pursues education and vocational

efforts that promote rehabilitation, *id.* § 3553(a)(2)(D). Further, Savage has a history of controlled substances use. *See* PSR ¶¶ 212-214. The Sentencing Commission explains: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3. Supervised release would ensure Savage addresses any substance abused issues after his release.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as these additional conditions: that the defendant submit to drug testing and attend substance abuse treatment as directed.

## IV. CONCLUSION

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Alexander B. Bowerman*
ALEXANDER B. BOWERMAN
MEGHAN CLAIBORNE BISIO
CHRISTOPHER DIVINY
SHAYNA GANNONE
EVERETT WITHERELL
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served by electronic filing on all counsel of record.

*/s/ Alexander B. Bowerman*
ALEXANDER B. BOWERMAN
Assistant United States Attorney

DATED: August 28, 2026